**FILED**

**September 12, 2023**
KAREN MITCHELL
CLERK, U.S. DISTRICT
COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| TOBY and CHRISTINA BROHLIN | § | |
| and CADILLAC CREEK | § | |
| OUTFITTERS, LLC | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:22-cv-00158-Z |
| | § | |
| MERIDIAN SECURITY | § | |
| INSURANCE COMPANY | § | |
| *Defendant.* | § | |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

TO THE HONORABLE COURT:

Plaintiffs, TOBY and CHRISTINA BROHLIN (the "**Brohlins**") and CADILLAC CREEK OUTFITTERS, LLC ("**Cadillac Creek**") (collectively, "**Plaintiffs**") file this Plaintiffs' Original Petition complaining of and against Defendant, MERIDIAN SECURITY INSURANCE COMPANY ("**Defendant**"), and for cause of action would respectfully show the Court as follows:

### I.      PARTIES

1.      Plaintiffs Toby and Christina Brohlin are married individuals who live at 6819 Club Meadows Dr., Amarillo, Potter County, Texas 79124.

2.      Plaintiff Cadillac Creek Outfitters, LLC is a Texas Limited Liability Company authorized to do business in the State of Texas.  Cadillac Creek maintains its principal office at 10601 66 Helium Road, Amarillo, Potter County, Texas 79124.

3.      Defendant Meridian Security Insurance Company is an Indiana Insurance Corporation that offers insurance coverage to Texas customers and specifically provided insurance to Plaintiffs on the property at issue in this suit.  Defendant maintains its principal

**EXHIBIT A**

office at 12900 N. Meridian St, Carmel, Indiana 46032. Defendant does not maintain a registered

agent in Texas. Defendant has been cited and has appeared through counsel.

## II.    JURISDICTION AND VENUE

4.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because

the amount in controversy exceeds $75,000.00 and there is complete diversity between the

parties.

5.    Although Defendant is a foreign entity, this Court has general jurisdiction over

Defendant because it has continuous and systematic contacts with Texas. The Court has specific

jurisdiction because Defendant has sufficient minimum contacts with the state and with Plaintiffs

through issuing an insurance policy covering real property in Texas. Further, Defendant removed

this case to this Court.

6.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a

substantial part of the events or omissions giving rise to the claim occurred and a substantial part

of property that is the subject of the action is situated within this district.

## III.    FACTS

### The Covered Event and Damages to Plaintiffs' Property

7.    Plaintiffs entered into an insurance contract (the "**Insurance Agreement**") with

Defendant to insure property at 66 Helium Rd., Amarillo, Potter County, Texas 79124

("**Property**"). Other property was insured under this same Insurance Agreement but is not

relevant to this case. The Property is located in Potter County, Texas.

8.    Plaintiffs are the Named Insureds under the Insurance Agreement, and Plaintiffs

fully performed all obligations under the Insurance Agreement and paid all the required

insurance premiums.



**EXHIBIT A**

9.    On May 1, 2022, during the coverage period of the Insurance Agreement, the Property sustained damage from hail (the "**Damage**"). Pursuant to the terms of the Insurance Agreement, this Damage was a covered event and Defendant should have provided insurance coverage to the Property for such covered event.

10.    Plaintiffs timely notified Defendant of the Damage and adhered to all conditions and requirements of the Insurance Agreement related to reporting the Damage and allowing Defendant to inspect and investigate Plaintiffs' claim.

11.    Defendant has failed and refused to provide coverage for the claim and/or wrongfully offered to settle the insurance claim for an amount substantially below the actual cost to repair the Damage, in violation of the Insurance Agreement. Defendant made a single payment of substantially less than the Damage to Plaintiffs' Property and made no indication that any further payments would be made. As a result of these failures, Plaintiffs were forced to file suit to seek to force the appraisal process against Defendant.

**<u>Appraisal</u>**

12.    After Defendant removed this case to this Court, Plaintiffs filed a Motion to Appoint Umpire and Request for Abatement on September 30, 2022, seeking to have the Court appoint Walter Viermann as the umpire for the appraisal process. Defendant agreed to Mr. Viermann's appointment as umpire.

13.    On October 17, 2022, the Court granted Plaintiffs' request for Mr. Viermann to be appointed umpire for the appraisal process and stayed the case pending resolution of the appraisal process.

14.    Thereafter, the appraisers designated by Plaintiffs and Defendant worked with Mr. Viermann to perform the appraisal process. At all times, Plaintiffs' appraiser and Mr. Viermann



acted in good faith and in accordance with the Insurance Agreement in performing their respective duties and obligations in the appraisal process.

15.    As Mr. Viermann explained in a letter to Defendant's appraiser, he performed research on the Property prior to a joint inspection in order to familiarize himself with the Property, generally, and with certain appurtenances on the Property, including pipe fencing.

16.    The appraisers and the umpire then jointly inspected the Property during the appraisal process—this was at least the second time Defendant had a representative inspect the Property. While the three inspected the Property, both appraisers were given the opportunity to defend their positions on damages to various aspects of the Property and give the opportunity to refute the other side's positions.

17.    After analyzing the Damages, Plaintiffs' appraiser and Mr. Viermann agreed to the amount of Plaintiffs' Damages and signed an award on February 21, 2023 (the "**Award**"), which is attached hereto as **Exhibit "A".** In the Award, Plaintiffs' appraiser and Mr. Viermann found the following damages to Plaintiffs' Property:

| Structure | Replacement Cost | Actual Cash Value |
|---|---|---|
| Dwelling | $483,038.18 | $461,621.78 |
| Appurtenant Structures | $347,525.03 | $331,053.39 |

18.    The Award was provided to both appraisers and to Plaintiffs and Defendant. After receiving the Award, Plaintiffs inquired of Defendant about receiving payment, given that the appraisal process was complete and Defendant had yet to validly deny coverage based on an applicable exclusion or other lack of coverage.

**EXHIBIT A**

19.     Instead, on April 3, 2023, nearly a year after the Covered Event, Defendant sent a letter to Plaintiffs (through counsel) refusing to pay the Award. Defendant's proffered reason for its denial was to question the good faith and honesty of Plaintiffs' appraiser and Mr. Viermann. A copy of this letter is attached as **Exhibit "B"**. The letter also purports to note "coverage issues" with Plaintiffs' Damages, but the only "coverage issue" noted is a deductible (which Plaintiffs have never denied owing). The other "coverage issues" noted in the letter is simply a copy and pasting of provisions in the Insurance Agreement without any effort to tie such provisions to the Damages. Defendant closes its letter by demanding additional documents related to the Property—documents it could have requested at any point in the 11 months prior to this letter. In truth, Defendant had no basis to refuse to pay the Award, and its decision to do so through Exhibit B was in bad faith.

20.     Despite the bad faith nature of Defendant's letter, Plaintiffs acted in good faith to provide the additional documents requested by Defendant in the Exhibit B letter. Plaintiffs provided additional information related to the Pella window bid on April 12, 2023. Plaintiffs allowed Defendant to perform yet another inspection of the Property on May 5, 2023. Plaintiffs then provided Defendant with hundreds of pages of additional documents after this inspection.

21.     After receiving these documents, Defendant remained unsatisfied and in June 2023 demanded that Plaintiffs provide more documents, including documents prior to Plaintiffs' purchase of the Property. Additionally, Defendant demanded Plaintiffs' contract with its appraiser.

22.     After receiving this June 2023 demand for additional documents, it became apparent that Defendant was no longer participating in the appraisal process in good faith and was instead attempting to find any possible reason to avoid the umpire's Award. Defendant

**EXHIBIT A**

doubled down on this position in a hearing on July 18, 2023, when it accused Mr. Viermann and Plaintiffs' appraiser of bad faith.

23.     Since the Award was issued, the only communication Plaintiffs received from Defendant related to the appraisal process or the Damages is the Exhibit B letter on April 3, 2023. The only other communications Plaintiffs received from Defendant were through its counsel and were either related to demands for documents or related to matters underlying this litigation.

24.     At no point since the Award has Defendant offered to pay any portion of the Award (other than the initial payment offered in the summer of 2022, which is approximately 14% of the replacement cost value of the Award). At no point since the Award has Defendant offered any explanation for its refusal to pay the Award, save and except the April 3, 2023 letter, which offers little to no substance. Instead, Defendant has acted in bad faith in resolving Plaintiffs' claim after the appraisal and breached its contractual obligations after the Award.

25.     Throughout this process, Plaintiffs allowed Defendant multiple inspections, provided Defendant with substantial documentation, and acted in good faith in participating in the appraisal process in the hopes that the would receive compensation from Defendant for the damages to the Property. Plaintiffs waited six months after the Award for Defendant to pay the Damages or at least offer some sum of money from the Award, but no such payment or offer was made. After allowing Defendant over six months from the Award and over a year since the covered weather event, Plaintiffs made demand of Defendant on August 16, 2023, attached hereto as **Exhibit "C"** and incorporated herein.

26.     Defendant continues to breach its contractual obligations under the Insurance Agreement by failing and refusing to pay the Damages to Plaintiffs' Property. Defendant has

**EXHIBIT A**

further consistently refused to make meaningful attempts to investigate and resolve Plaintiffs' insurance claim and has actively attempted to mischaracterize and manipulate evidence to misrepresent coverage for, the value of, and the cause of, the Damages, in violation of the Texas Insurance Code by knowingly:

    a.  Failing to adopt policies and procedures necessary to adequately investigate and resolve claims;

    b.  Failing to employ trained adjusters and employees in the proper methods of investigating and resolving claims, or else by failing to adopt policies and procedures necessary to adequately evaluate the qualifications of individuals upon whom the insurer would rely for purposes of investigating and resolving claims;

    c.  Failing to adopt policies and procedures necessary to adequately evaluate the veracity, bias or prejudice, and overall competency of the opinions of third-parties whom they hire and/or on whom they rely;

    d.  Performing, or hiring to be performed, a superficial, biased, and conclusory investigation of the damage at issue despite overwhelming contradictory evidence to their conclusion;

    e.  Failing to competently apply the facts of the claim to the Insurance Agreement to make the correct coverage decision;

    f.  Attempting to settle a claim without performing a full and adequate investigation of the loss;

    g.  Refusing to acknowledge reports and uncontradicted facts provided by Plaintiffs;



**EXHIBIT A**

h.  Wrongfully denying the claim;

i.  Unreasonably delaying settlement offers despite Defendant's liability becoming reasonably clear;

j.  Making misstatements of material fact about the cause, scope, and value of Damages, including that the damage was not caused by the 2022 hail storm and the damage was excluded;

k.  Failing within a reasonable time to affirm or deny coverage of a claim;

l.  Failing to timely request all items, statements, and forms necessary to evaluate the claim; and

m.  Failing to timely pay the claim.

27.   All conditions precedent to the filing of this suit and bringing the claims below have occurred.

<h3 style="text-align:center">IV.   <u>CAUSES OF ACTION</u></h3>

**<u>Breach of Contract</u>**

28.   Plaintiffs reassert the allegations contained in paragraphs 1 through 27 above as if restated herein.

29.   Plaintiffs and Defendant are parties to the Insurance Agreement which is a valid and enforceable contract. Plaintiffs fully performed all contractual obligations under the Insurance Agreement and paid all premiums to Defendant. Defendant breached the contract by failing to adequately compensate Plaintiffs for the Damage under the terms of the Insurance Agreement.

30.   Defendant further breached the Insurance Agreement by failing to participate in good faith in the appraisal process. After being given reasonable opportunities to provide the



EXHIBIT A

umpire with documents, data, information, and arguments, the umpire made an Award, which was agreed to by Plaintiffs' appraiser. Defendant failed to honor the award and the process and has, instead, knowingly and intentionally ignored the Award, refusing to pay any sums toward the Award that are over and above Defendant's initial damage estimate.

31.    As a result of Defendant's breach of contract, Plaintiffs have sustained financial harm and has lost the expected benefit of the Insurance Agreement had Defendant performed as required.  Plaintiffs seek to recover the amounts they should have been paid under the terms of the Insurance Agreement for the Damage.

32.    Plaintiffs also seek to recover reasonable attorneys' fees as authorized by Section 38.001 of the Texas Civil Practice and Remedies Code and the Texas Insurance Code.

**<u>Violations of Chapter 541 of the Texas Insurance Code</u>**

33.    Plaintiffs reassert the allegations contained in paragraphs 1 through 27 above as if restated herein.

34.    Plaintiffs and Defendant are persons under Texas Insurance Code Section 541.002(2).

35.    Defendant engaged in an act or practice that violated Texas Insurance Code Chapter 541 and a tie-in provision of the Texas Insurance Code in that Defendant:

      i.    Failed to make a good-faith attempt to offer a fair, prompt, and equitable settlement of a claim when its liability had become reasonably clear;

     ii.    Failed to promptly provide Plaintiff a reasonable explanation of the factual and legal basis in the policy for its settlement offer; and

   iii.    Refused to pay a claim without conducting a reasonable investigation of the claim.

36.    Specifically, Defendant failed to make a good-faith offer to settle the claim once liability and Damage became reasonably clear. Defendant further failed to make a good-faith offer to settle after receiving the Award. Defendant's correspondence further failed to provide a



**EXHIBIT A**

reasonable factual and legal basis for its settlement offer amount and because Defendant knew the cost to repair the Damage was substantially more than it offered, it did not make a good-faith attempt to offer any settlement though liability and the cost to repair the Damage had become reasonably clear. Defendant became specifically aware that its sole offer to settle was substantially less than the amount of Plaintiffs' damages after receiving the Award, yet Defendant has failed to offer any further amounts to Plaintiffs.

37.     These actions or inactions of Defendant in violation of Chapter 541 are each a producing cause of Plaintiffs' actual damages, including loss of use and benefits. Moreover, Defendant's violations of Chapter 541 likely will result in damages above the loss of limits of the Insurance Agreement, for which Plaintiffs seek recovery. Plaintiffs also seek to recover actual damages, treble damages, prejudgment and post-judgment interest, court costs, and reasonable and necessary attorney's fees pursuant to Texas Insurance Code Section 541.152.

**Violations of Chapter 542 of the Texas Insurance Code**

38.     Plaintiffs reassert the allegations contained in paragraphs 1 through 27 above as if restated herein.

39.     Defendant is liable for payment of the claim because it insured against direct physical loss of or damage to the Property resulting from a covered cause of loss, like hail impacts. Defendant violated the statutory requirements of Chapter 542 of the Texas Insurance Code in the following ways:

      a. Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under the insurer's policies (Section 542.003(b)(3));

**EXHIBIT A**

b.  Not attempting in good faith to effect a prompt, fair, and equitable settlement of a claim submitted in which liability has become reasonably clear (Section 542.003(b)(4));

c.  Failing to pay amounts due within 5 business days of receipt of the information necessary to pay the claim (Section 542.057); and

d.  Failing to pay the claim in whole within 60 days after receiving all information necessary to pay the claim—specifically including Defendant's receipt of the Award (Section 542.058).

40.    Specifically, Defendant received the Award on or about February 21, 2023. The Award was for substantially more in damages than Defendant's initial offer of $104,322.25 (which included a reduction for the applicable deductible). Despite receiving the Award, Defendant has yet to pay any portion of the Award and has instead intentionally engaged in tactics to delay and avoid its obligation to pay the Award.

41.    Plaintiffs seek to recover actual damages for loss of use and benefits, and an amount above policy limits due to its delay. Plaintiffs also seek to recover loss of use, exemplary damages, prejudgment and post-judgment interest, and court costs.

**<u>Violations of the Texas Deceptive Trade Practices Act</u>**

42.    Plaintiffs reassert the allegations contained in paragraphs 1 through 27 above as if restated herein.

43.    Pursuant to section 17.50(a)(4) of the Texas Business and Commerce Code, Defendant violated the DTPA by violating Chapter 541 of the Texas Insurance Code in the manners stated in above, which were each a producing cause of Plaintiffs' damages. Plaintiffs

**EXHIBIT A**

provided notice to Defendant of the Chapter 541 violations and noted that they would seek DTPA damages.

44.     Pursuant to Sections 17.50(b)(1) and (d), Plaintiffs seek economic damages, treble damages, court costs, and reasonable and necessary attorneys' fees.

### Breach Duty of Good Faith and Fair Dealing

45.     Plaintiffs reassert the allegations contained in paragraphs 1 through 27 above as if restated herein.

46.     The Insurance Agreement between Plaintiffs and Defendant created a duty of good faith and fair dealing, and Defendant owed common law and statutory duties of good faith and fair dealing. Defendant breached its duty when it denied payment when liability was reasonably clear. Specifically, the Insurance Agreement covered all physical loss to the Property, and Defendant offered an amount well below the necessary costs to repair the Damage sustained by the Property and has failed to act in good faith through the appraisal process and after the Award was issued February 21, 2023.

### Declaratory Judgment

47.     Plaintiffs reassert the allegations contained in paragraphs 1 through 27 above as if restated herein.

48.     Plaintiffs are parties interested under the Insurance Agreement. Plaintiffs seek a declaration of construction and/or validity of such Insurance Agreement and seek a declaration from this Court of the rights, status, or other legal relations of Plaintiffs and Defendant under such agreements.

49.     Plaintiffs seek a declaration from this Court that, per the appraisal provision in the Insurance Agreement, Plaintiffs' Damages are set in the amounts set forth by the Award.



Plaintiffs further seek declarations that they fully complied with the requirements for appraisal under the Insurance Agreement, the umpire and Plaintiffs' appraiser determined the amount of Damages, and the Damages are applicable to Plaintiffs' claims in this suit.

50.     Plaintiffs further seek to recover their reasonable and necessary attorneys' fees, as are equitable and just, in accordance with Section 37.009 of the Texas Civil Practice and Remedies Code.

### Attorneys' Fees

51.     Plaintiffs reassert the allegations contained in paragraphs 1 through 27 above as if restated herein.

52.     Due to the above-described actions or inactions of Defendant, Plaintiffs engaged the services of the undersigned law firm, and have agreed to pay it a reasonable fee for the prosecution of its claims, through a final judgment, and in the event of an appeal. Plaintiffs seek to recover those fees pursuant to Texas Civil Practice & Remedies Code chapter 38 and Texas Insurance Code sections 541.152 and 542.060.


### Jury Demand

53.     Plaintiffs demand a jury trial.

### PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully pray that Defendant be cited to appear and answer herein, and upon final hearing of the case judgment be entered for Plaintiffs against Defendant the following:

a)     Judgment against the Defendant for actual damages within the jurisdictional limits of the Court.

b)     Treble damages.



**EXHIBIT A**

c)      Declarations as requested in Paragraphs 48 and 49, above.

d)      Prejudgment interest as provided by law, including heightened interest rates for Defendant's violations of Chapters 541 and 542 of the Texas Insurance Code.

e)      Reasonable and necessary attorneys' fees in an amount determined by the trier of fact.

f)      Post-judgment interest as provided by law, including heightened interest rates for Defendant's violations of Chapters 541 and 542 of the Texas Insurance Code as applicable, from the date of judgment until paid.

g)      Costs of suit.

h)      Such other and further relief to which Plaintiffs may be entitled.

Respectfully submitted,

Matt W. Sherwood
State Bar No. 24066063
msherwood@mwlawfirm.com
McCARN & WEIR, P.C.
905 S. Fillmore, Suite 530
Amarillo, TX  79101
Telephone: (806) 350-5395
Facsimile: (806) 350-5388

By: /s/ Matt W. Sherwood_____
     Matt W. Sherwood

**ATTORNEYS FOR PLAINTIFFS**

F:\DOCS\7717\002\PLEADING\2JZ3923.DOCX

**EXHIBIT A**

## <u>CERTIFICATE OF SERVICE</u>

   This is to certify that a true and correct copy of the foregoing instrument has been served as indicated below on this 11th day of September, 2023 to:

Patrick M. Kemp          ***Via Email pkemp@smsm.com***
Robert G. Wall           ***Via Email rwall@smsm.com***
C Daniel DiLizia          ***Via Email ddilizia@smsm.com***
Segal McCambridge Singer & Mahoney
100 Congress Ave., Suite 800
Austin, Texas 78701

         */s/ Matt W. Sherwood*
         Matt W. Sherwood



# EXHIBIT A

|  | Replacement Cost | Actual Cash Value |
|---|---|---|
| Dwelling | $ 483,038.18 | $ 461,621.78 |
| Appurtenant Structures | $ 347,525.03 | $ 331,053.39 |

Witness our hands This 21st. day of February 2023.

*Brady Owens*
Appraiser

_____
Appraiser

_____
Umpire

**EXHIBIT A**



April 3, 2023

Matt W. Sherwood
McCarn & Weir
905 S. Fillmore, Suite 530
Amarillo, Texas 79101

| | |
|---|---|
| **Claim Number:** | PR-0000000-430197 |
| **Policy Number:** | 1001230721 |
| **Date of Loss:** | 05/01/2022 |
| **Date Claim Received:** | 06/02/2022 |
| **Our Policyholders:** | Christina Brohlin and Toby Brohlin |

Dear Mr. Sherwood:

As you know, Meridian Security Insurance Company ("State Auto") issued Policy No. 1001230721 (the "Policy") to your clients listing 66 Helium Road, Amarillo, Texas 79124 as the insured location, with effective dates of August 16, 2021 to August 16, 2022.

Your clients submitted a claim for property damage on June 2, 2022, reporting that a wind and hail event occurred on May 1, 2022. An inspection of the property was conducted by Bradley Wynne on June 6, 2022, after which State Auto claim representative Loren Craft finalized a repair estimate that was e-mailed to Mr. Brohlin on June 14, 2022. The total estimated repair cost was $132,531.29 at replacement cost value and $112,741.25 at actual cash value. An actual cash value payment in the amount of $104,322.25 was issued on June 14, 2022, after applying the $8,419 deductible. The fence on the stable barn was not included as the damages appeared to be ongoing damages and historical in nature, including cracked paint and rusting spots from long term damages.

Mr. Brohlin responded to Mr. Craft's e-mail on June 14, 2022, indicating he had an estimate from a window company, that there were additional structures damaged on the property that were not included in the estimate, and that while he understood there were rust spots on the fence, the fence itself is painted pipe, which is all rust before painted, and that the entire fence was painted in August. Mr. Craft replied the same day, noting he had not been provided the window estimate, that there was mechanical damage to a detached garage unrelated to storm damage, that he did not find any photographs of damage to a pump house, and informed Mr. Brohlin that there were marks below the poles on the fence indicating damage being claimed was unrelated to hail damage.

Subsequently, Mr. Craft was provided a quote from Pella dated May 13, 2022 reflecting a taxable subtotal of $219,705.02, a nontaxable subtotal of $36,053.40, and a total of $255,758.42. The Pella quote seemingly included replacement all of the windows on the dwelling, which was many more windows than had been noted as having hail impact marks to the trim on inspection

**Corporate Headquarters 518 East Broad Street  Columbus, Ohio 43215      614.464.5000      StateAuto.com**



Brohlin
April 3, 2023
Page 2

by Mr. Wynne.  Mr. Craft spoke with the Pella estimator, Patrick Newman, who confirmed the windows on the dwelling were not manufactured by Pella but instead by HURD, a company no longer in business.  Mr. Newman also confirmed Pella could provide an estimate that was limited to only the windows that had trim with hail impact marks.

On June 20, 2022, Mr. Brohlin provided a copy of an estimate from Alliance Construction & Consulting dated May 13, 2022, totaling $761,826.96 at replacement cost value. Mr. Craft informed Mr. Brohlin on June 20 that a reinspection of the property was being requested.  State Auto then received a letter from Mr. Brohlin dated June 16, 2022, invoking the appraisal clause in the policy and designating Brady Owens of Alliance Construction & Consulting as the appraiser.  Mr. Craft sent a letter on June 21, 2022 to Mr. Brohlin and the appraisers, Scott Lansing and Brady Owens, acknowledging the appraisal process and asking, among other things, that the pre-purchase inspection report of the property be provided by the insureds to all parties to review the condition of the property at purchase.  Mr. Craft also asked that a determination be made on the value of the original windows on the home manufactured by HURD, specifically for the windows that contained actual hail damage on the aluminum trim.

As you know, on July 19, 2022, you filed a lawsuit on behalf of the Brohlins against State Auto, which was stayed pending completion of the appraisal process.

An appraisal award was signed by umpire Walter Viermann and Brady Owens on February 21, 2023, that states as follows:

|  | Replacement Cost | Actual Cash Value |
|---|---|---|
| Dwelling | $ 483,038.18 | $ 461,621.78 |
| Appurtenant Structures | $ 347,525.03 | $ 331,053.39 |

Notably, the awarded amounts that total $830,563.21 at replacement cost value and $792,675.17 at actual cash value are higher than the estimate from Alliance Construction & Consulting dated May 13, 2022 that had previously been submitted to State Auto and the totals match the revised Alliance Construction & Consulting estimate printed on February 21, 2023.

State Auto is currently investigating whether the appraisal process was flawed and whether the resulting award is an inaccurate assessment of loss or damage.

The umpire, Walter Viermann, did not inspect the property until February 16, 2023.  He did not prepare an estimate for the appraisers to consider.  Instead, Mr. Viermann utilized the Alliance Construction & Consulting estimate from Brady Owens as the basis of the award after requesting information and certain changes to the estimate.  However, despite representations by Mr. Owens that all of the requested changes had been made, it is apparent they were not.  The following are e-mail exchanges among the appraisal panel that began on February 21, 2023:

On February 21, 2023, at **4:18 p.m.**, umpire Walter Viermann sent the following e-mail:

**Alliance Estimate**



**EXHIBIT B**
**EXHIBIT A**

Brohlin
April 3, 2023
Page 3

Mr. Owens,

The items I have listed below I would request that these be removed from the Alliance Estimate except for the Pella Window estimate and it needs to be revised to only include the windows on the front, left and rear elevations. It appears that their estimate is for all the windows, and the way it is formatted they have the units together and not separated as we discussed during our meeting, if this is correct then the number of windows should be around 17 as Scott has on his estimate.

If we can not get a copy of the roofing materials that were installed then I would request the Alliance estimate for shingles be revised to the 30 yr. laminate.

I would request that these items be removed from Alliance estimate.

**General Job Requirements**
Roof Evaluation
Two Ladders with Jack – should use either ladders or scaffold.
Cleaning Technician – Final cleaning is already on estimate and Cleaning Technician is on the estimate twice.
Builders Risk Insurance – Contractors are responsible for their own insurance.

**Detached garage.**
R&R Drape roll insulation (no insulation was found)

**Trees**
No images in either file to show damages – Scott's photos show trees standing and not on/in the pool.

In review of the window bid from Pella I would request that their estimate be revised as addressed below.

**Pella Windows**
Estimate – need estimate for just affected windows, after review of their estimate it appears that this is for all the windows.

**The items below were found on the Riverstone estimate.**

**Riverstone**

**EXHIBIT B**
# EXHIBIT A

Brohlin
April 3, 2023
Page 4

The items listed below are not found on the Alliance estimate and as these were found to have been estimated for storm damages by the carrier, they may be included on the Alliance estimate so that the scope of work is correct

**Roof** includes 8 Gable cornice returns.

**Barn/Stable**
Includes 2 Cupola for exhaust.

**Well House**
Paint Brick

If either of you gentlemen have any additional information that you would like for us to consider please email it to us.

Once the revisions have been made please submit the estimate for our consideration.

On February 21, 2023, at **5:44 p.m.**, appraiser Brady Owens sent the following e-mail:

Mr. Viermann,

I have reviewed included, & conceded to your request as the attached revised line item detail. I was only provided a document on the roof from a inspector, so it was not from the original contractor who installed the roof in July of 2021. I have also spoken to the window representatives and changed the prices for the damaged window, in regards to the windows of what was taken out is Line# 10,15,20,&65. The rest of the windows were confirmed with damages during the inspection. The trees were included from the original inspector from State Auto, but I have also taken out because not photographs have been provided to me to date. Please let me know if there is any other items or information you would like to take in to consideration. Thank you both in advance.

On February 21, 2023, at **6:36 p.m.**, umpire Walter Viermann sent the following e-mail:

Gentlemen,
I have attached a copy of the Award, please sign and return a copy to me.

Thanks,

On February 21, 2023, at **8:56 p.m.**, appraiser Scott Lansing sent the following e-mail:

Mr. Viermann,
I am just now viewing the emails relating to the estimate. Am I to understand that you are using the Alliance estimate with the aforementioned revisions? It is



**EXHIBIT B**
**EXHIBIT A**

Brohlin
April 3, 2023
Page 5

customary to allow time for the panel to review the estimate and discuss it before
the umpire signs the award to be executed.  I will be on the road for the next two
days with time on Friday to review and reply.

On February 22, 2023, at **12:28 a.m.**, appraiser Scott Lansing sent the following e-mail:
Mr. Viermann,
In consideration of the final statement of your email earlier today at 4:18 pm you
wrote:

"If either of you gentlemen have any additional information that you would like
for us to consider please email it to us.

Once the revisions have been made please submit the estimate for our
consideration."

At 6:36 pm you issued an award with your signature.  I think you would agree
with me that allowing less than 2 1/2 hours to respond is not a reasonable
allowance of time.  As mentioned in my previous email, I do not have adequate
time to fully address all of the items of concern at this time but the following list
is from my initial review:

- Off-site storage & insurance $5,767.56?
- Equipment operator 120 hrs?
- Scaffolding rental when you have a telehandler?
- The sq ft of the dwelling roof needs to be confirmed as our numbers are
significantly different
- Can you provide photo documentation that the exhaust fans on the roof were
damaged/
- Did you verify the "impact resistant" ridge cap shingles?
- Did you verify the double layer of starter?
- Where is the confirmed window pricing?
- CCTV camera & brackets totaling 13,239.88?
- Exterior light fixture damage?
- Only the left and rear elevations of the Detached garage displayed impact
damage
- 160 Painter hours ($15,659.52) in addition to the $13,771.08 allowance to paint
the fence?
- Well House: double layer starter? impact resistant confirmed?

On February 22, 2023, at **10:07 a.m.**, umpire Walter Viermann sent an e-mail stating in
part:

At the time we met for the inspection of the property both appraisers were given
more than ample time to support their positions and to refute the others position.

**EXHIBIT B**
**EXHIBIT A**

Brohlin
April 3, 2023
Page 6

During this time, we walked the property and both appraisers were allowed to state how they defended their positions or refuted the others.

I also explained that I had begun my review of the documents provided prior to this meeting and had put together an estimate on the fence painting. I also explained that the tax appraisal office showed the amount of pipe fence on the property and the estimate that I did came close to the amount provided on Alliance estimate.

We also discussed the Pella window estimate and after review I found that some of the windows that were included on their estimate should not be included as part of the scope of work. Mr. Owens removed the cost of these windows from the estimate provided by Pella.

I have reviewed all documentation that was given by both parties and have found discrepancies in both positions, such as the roofing square footage on both Eagleview documents.

I requested that the Alliance estimate be revised based on this review.

It was apparent that since this claim has gone to the appraisal process that there was a difference in the amount of the loss. It is also apparent that there was a delay in this process as I was appointed by the United States District Court For The Northern District Of Texas Amarillo Division to umpire in this case back in October 2022. I also explained in a prior email that once the payment was received from the carrier, as I had already received payment from the policy holder, I would be forwarding our decision in this matter.

It is not our position to determine the coverage issues only the amount of the loss.

. . . . .

Mr. Owens has signed the award as have I, and it has been sent to you as well. You may choose to either sign it or not, however as there are two parties in agreement for the amount set for the loss the award is binding.

Please let the panel know of your decision to sign or not sign the award.

These e-mail exchanges raise concerns with the fairness of the appraisal process in this matter and whether there was a proper assessment of necessary repairs.

For example, Mr. Lansing asked "where is the confirmed window pricing?" but was apparently given no direct response. Mr. Owens had represented that lines 10, 15, 20, and 65 were removed from the Pella quote, which were windows he seemingly conceded were not damaged. But apparently no document was provided to establish the revised quote amount. It is important to note that the pricing in the Pella quote was not itemized so it is not possible to remove line items recalculate the total without a new quote from Pella. It is also important to



**EXHIBIT B**
**EXHIBIT A**

Brohlin
April 3, 2023
Page 7

note that the revised Alliance Construction & Consulting presented by Mr. Owens after representing to the umpire that four undamaged windows had been removed from the Pella quote was listed at $219,705.02, which is the exact amount of the taxable subtotal listed on the Pella quote created May 13, 2022. Mr. Viermann stated in his e-mail that "Mr. Owens removed the cost of these [undamaged] windows from the estimate provided by Pella," but nothing has been provided to establish that representation by Mr. Owens was true or that the revised estimate amount was accurate for the specific windows the umpire determined should be included while excluding all others.

As another example, Mr. Viermann had asked Mr. Owen to remove the "cleaning technician" from the General Job Requirements section since final cleaning was already on the estimate. However, the change was not made as requested, despite a representation by Mr. Owens that he had "reviewed included, & conceded to" the umpire's requested changes. However, the revised Alliance Construction & Consulting still had both 120 hours for a "cleaning technician" at a cost of $6,096.47, and an allowance of $4,871.26 for 15,000 square feet of residential cleaning.

Numerous other questions exist regarding the Alliance estimate that formed the basis of the appraisal award and whether it is an accurate assessment of necessary repairs from the storm, many of which were raised with the umpire but were not addressed. Those questions include: (1) whether there was any damage to some of the building components included in the appraisal award, such as certain detached garage elevations, exterior lighting, CCTV cameras and brackets, and exhaust fans; (2) whether some of the building components included in the appraisal award are present on the property, such as impact resistant ridge cap shingles, double starter layers, and stucco; and (3) whether charges are reasonable and necessary and customarily included in an estimate bid submitted to a homeowner for residential repairs, such as 120 hours for an equipment operator, 160 hours for project managers and supervisors in addition to contractor overhead and profit, rental charges for both a telehandler and scaffolding, charged for rental of lanyards that contractors should own, 160 hours for painting the fence at a cost of $15,659.52 in addition to the $13,771.08 allowance to paint the fence, residential cleaning based on 15,000 square feet without verification of square footage, over $13,000 for CCTV cameras and brackets, and whether it was known that changes had been made to unit pricing in Xactimate on the Alliance estimate.

Furthermore, an appraisal panel has no authority to determine coverage issues. Coverage issues exist with this claim. The Policy insures against direct physical loss to covered property. However, the Policy contains limitations and exclusions, including a deductible in the amount of $8,419, and certain applicable losses not insured and exclusions set forth below. The Policy states:

### HOMEOWNERS 3 – SPECIAL FORM

**AGREEMENT**
We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy.



**EXHIBIT B**
# EXHIBIT A

. . .

## SECTION I – PERILS INSURED AGAINST
### A. Coverage A – Dwelling And Coverage B – Other Structures
**1.** We insure against direct physical loss to property described in Coverages **A** and **B.**

**2.** We do not insure, however, for loss:
    **a.** Excluded under Section **I** – Exclusions;

. . .

    **c.** Caused by:
      (6) Any of the following:
        (a) Wear and tear, marring, deterioration;
        (b) Mechanical breakdown, latent defect, inherent vice or any quality in property that causes it to damage or destroy itself;
        (c) Smog, rust or other corrosion, wet or dry rot; [as amended by Special Provisions – Texas]

. . .

        (f) Settling, shrinking, bulging or expansion, including resultant cracking, of bulkheads, pavements, patios, footings, foundations, walls, floors, roofs or ceilings;

. . .

## SECTION I – EXCLUSIONS

. . .

**B.** We do not insure for loss to property described in Coverages **A** and **B** caused by any of the following. However, any ensuing loss to property described in Coverages **A** and **B** not precluded by any other provision in this policy is covered.

. . .

    **3.** Faulty, inadequate or defective:
      **a.** Planning, zoning, development, surveying, siting;
      **b.** Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
      **c.** Materials used in repair, construction, renovation or remodeling; or
      **d.** Maintenance;
      of part or all of any property whether on or off the "residence premises".

. . .

## SECTION I – CONDITIONS

### A. Insurable Interest And Limit Of Liability
Even if more than one person has an insurable interest in the property covered, we will not be liable in any one loss:

1. To an "insured" for more than the amount of such "insured's" interest at the time of loss; or

2. For more than the applicable limit of liability.

**EXHIBIT B**

**EXHIBIT A**

Brohlin
April 3, 2023
Page 9

**B. Deductible**
Unless otherwise noted in this policy, the following deductible provision applies:

With respect to any one loss:

1. Subject to the applicable limit of liability, we will pay only that part of the total of all loss payable that exceeds the deductible amount shown in the Declarations.

2. If two or more deductibles under this policy apply to the loss, only the highest deductible amount will apply.

**D. Loss Settlement**
In this Condition **D.**, the terms "cost to repair or replace" and "replacement cost" do not include the increased costs incurred to comply with the enforcement of any ordinance or law, except to the extent that coverage for these increased costs is provided in **E.11.** Ordinance Or Law under Section **I** – Property Coverages. Covered property losses are settled as follows:

    **1.** Property of the following types:
        **a.** Personal property;
        **b.** Awnings, carpeting, household appliances, outdoor antennas and outdoor equipment, whether or not attached to buildings;
        **c.** Structures that are not buildings; and
        **d.** Grave markers, including mausoleums;
        at actual cash value at the time of loss but not more than the amount required to repair or replace.

    **2.** Buildings covered under Coverage **A** or **B** at replacement cost without deduction for depreciation, subject to the following:
        **a.** If, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace, without deduction for depreciation, but not more than the least
of the following amounts:
            **(1)** The limit of liability under this policy that applies to the building;
            **(2)** The replacement cost of that part of the building damaged with material of like kind and quality and for like use; or
            **(3)** The necessary amount actually spent to repair or replace the damaged building.
            If the building is rebuilt at a new premises, the cost described in **(2)** above is limited to the cost which would

**EXHIBIT B**
# EXHIBIT A



Brohlin
April 3, 2023
Page 10

have been incurred if the building had been built at the original premises.

**b.** If, at the time of loss, the amount of insurance in this policy on the damaged building is less than 80% of the full replacement cost of the building immediately before the loss, we will pay the greater of the following amounts, but not more than the limit of liability under this policy that applies to the building:

> **(1)** The actual cash value of that part of the building damaged; or
>
> **(2)** That proportion of the cost to repair or replace, without deduction for depreciation, that part of the building damaged, which the total amount of insurance in this policy on the damaged building bears to 80% of the replacement cost of the building.

**c.** To determine the amount of insurance required to equal 80% of the full replacement cost of the building immediately before the loss, do not include the value of:

> **(1)** Excavations, footings, foundations, piers, or any other structures or devices that support all or part of the building, which are below the undersurface of the lowest basement floor;
>
> **(2)** Those supports described in **(1)** above which are below the surface of the ground inside the foundation walls, if there is no basement; and
>
> **(3)** Underground flues, pipes, wiring and drains.

**d.** We will pay no more than the actual cash value of the damage until actual repair or replacement is complete. Once actual repair or replacement is complete, we will settle the loss as noted in **2.a.** and **b.** above.

. . .

**e.** You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss to buildings on an actual cash value basis. You may then make claim for any additional liability according to the provisions of this Condition **D.** Loss Settlement, provided you notify us, within 180 days after the date of loss, of your intent to repair or replace the damaged building.

. . .

**F. Appraisal**

If you and we fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent and impartial appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of



**EXHIBIT B**
# EXHIBIT A

Brohlin
April 3, 2023
Page 11

record in the state where the "residence premises" is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of loss.

Each party will:
**1.** Pay its own appraiser; and
**2.** Bear the other expenses of the appraisal and umpire equally.

. . .

**Q. Policy Period**
This policy applies only to loss which occurs during the policy period.

. . .

## SPECIAL PROVISIONS – TEXAS

. . .

**C. Duties After Loss**

**1. Your Duties After Loss**

In case of a loss to covered property, we have no duty to provide coverage under this Policy if the failure to comply with the following duties is prejudicial to us. These duties must be performed either by you, an "insured" seeking coverage or a representative of either:

. . .

e.        Cooperate with us in the investigation of a claim.

. . .

g.        As often as we reasonably require:
(1) Show the damaged property;
(2) Provide us with records and documents we request and permit us to make copies;

. . .

**J. Loss Payment**
We will adjust all losses with you. We will pay you unless some other person is named in the Policy or is legally entitled to payment.

If we notify you that we will pay your claim, or part of your claim, we must pay within five "business days" after we notify you. If payment of your claim or part of your claim requires the performance of an act by you, we must pay within five "business days" after the date you perform the act.

**STATE AUTO'S REQUEST FOR DOCUMENTS, INFORMATION, AND PROPERTY INSPECTION**



**EXHIBIT B**
# EXHIBIT A

Brohlin
April 3, 2023
Page 12

In reference to your clients' duties after loss, State Auto requests the following:

1.   The pre-purchase inspection report of the property requested by State Auto in its letter dated June 21, 2022;

2.   The seller's disclosures in connection with the purchase of the property;

3.   All documents reflecting repairs and maintenance to the pole fence, which Mr. Brohlin indicated was painted in August 2021, including any estimates and invoices for painting and repairs both prior to the date of loss of May 1, 2022 and since the date of loss.

4.   All documents reflecting replacement or repairs to the roofs of any of the buildings on the property including the roof on the dwelling that Mr. Owens indicated had been replaced by a contractor in July 2021, including any estimates and invoices for repairs or replacements both prior to the date of loss of May 1, 2022 and since the date of loss.

5.   All estimates, bids, quotes, contracts, and communications with window sellers, contractors, and suppliers, including Pella, related to windows at the property.

6.   The identity and contact information for all persons who performed work on the pole fence and roofs at the property.

State Auto also requests the opportunity to inspect the property with experts at a mutually agreeable time.  As you know, State Auto has retained Patrick Kemp with the law firm Segal McCambridge to defend State Auto in the lawsuit filed by the Brohlins.  The inspection can be scheduled directly with his office.  He can be reached by telephone at (512) 370-1235 or by e-mail at pkemp@smsm.com. He has also been asked to contact you regarding the inspection request and other documents and information requested.

### RESERVATION OF RIGHTS

State Auto is continuing to investigate this claim and nothing in this letter should be interpreted as a waiver of State Auto's defenses, whether set forth in the insurance policy, any statute, or at common law.  State Auto reserves all rights under the policy and applicable law.

It is possible that there are additional reasons why coverage would not apply. Neither this letter nor any act by any representative of State Auto should be construed to be a waiver of any of the policy terms and conditions. On the contrary, State Auto specifically reserves the right to rely on the policy language and Texas law, and to deny coverage for any valid reason that may exist.



**EXHIBIT B**
**EXHIBIT A**

Brohlin
April 3, 2023
Page 13

Respectfully,

**Julie Wallace**
Sr. Tech Claims Specialist II
Property Litigation - State Auto
Julie.Wallace@stateauto.com

**EXHIBIT B**
# EXHIBIT A



**EXHIBIT B**
# EXHIBIT A



**MᴄCARN & WEIR**
ATTORNEYS AT LAW

**Matt W. Sherwood**
**806-350-5395**
**msherwood@mwlawfirm.com**

*Licensed in Texas and Oklahoma*

*Board Certified, Civil Trial Law*
*Board Certified, Personal Injury Trial Law*
*Texas Board of Legal Specialization*

August 16, 2023

Meridian Security
518 East Broad Street
Columbus, Ohio 43215                    ***Via Certified Mail, Return Receipt Requested***

Patrick Kemp, Esq.
Segal McCambridge
100 Congress Avenue, Suite 800
Austin, Texas 78701                     ***Via Email pkemp@smsm.com***

Re:     Insured:       Toby and Christina Brohlin
        Policy No.:    1001230721
        Policy Period: 8/16/2021 – 8/16/2022
        DOL:           May 1, 2022

Ladies and Gentlemen:

As you are aware, this firm represents Toby and Christina Brohlin (the "**Brohlins**") regarding its claim for insurance coverage related to a hail and windstorm that occurred on May 1, 2022 (the "**Covered Event**") and caused property damage to certain improvements located at 66 Helium Road, Amarillo, Texas 79124 ("**Covered Property**"). As of the date of the Covered Event, Meridian Security ("**Meridian**") provided commercial property insurance for the Covered Property through Policy Number CPS7560982 (the "**Policy**"), which was purchased by the Brohlins. The Brohlins previously provided notice of the Covered Event by making a claim under the Policy.

This letter is sent as the Brohlins's notice, in accordance with Sections 541.154 and 542A.003 of the Texas Insurance Code, to allow Meridian the opportunity to resolve the Brohlins' claims without facing additional damages for attorneys' fees and costs, among other available damages.

The Policy provides coverage for the Brohlins' dwelling on the "residence premises," other structures on the "residence premises," and a myriad of personal property items. The Brohlins' dwelling and other structures sustained damage in the Covered Event, and the Brohlins timely provided notice of the Covered Event to Meridian. As of the date of this letter, Meridian has had



**EXHIBIT C**
# EXHIBIT A

Meridian Security
Patrick Kemp, Esq.
Page 2
August 16, 2023

the opportunity to inspect the Covered Property on multiple occasions with multiple professionals of its choosing. On September 30, 2022, the Brohlins requested a stay and the appointment of an umpire for the appraisal process under the Policy. On October 17, 2022, the Court stayed the matter and appointed Walter Viermann as the umpire to manage the appraisal of this insurance dispute, noting that Meridian agreed to Mr. Viermann's appointment as umpire.

Meridian's chosen appraiser for the appraisal process had access to any information he wished to request, participated in the appraisal process, spoke with the umpire, reviewed the Covered Property, and was able to provide his proposed appraisal to Mr. Viermann. After reviewing the information provided, Viermann issued his umpire's award. Meridian was provided a copy of this award at the time it was issued.

To date, Meridian has failed and refused to honor the appraisal process, which is a breach of its contractual obligations and a violation of the Texas Insurance Code. Meridian has wholly failed to pay even a portion of the umpire's award. Instead, Meridian has intentionally and knowingly refused to honor its contractual and statutory obligations to timely investigate and pay the Brohlins' claims. Meridian's proffered reasons for such delay are in bad faith, as Meridian has, without evidence, accused the umpire of acting in bad faith in making his decision. Meridian also recently requested the Brohlins' agreement with their appraiser and made accusations against this appraiser in open court. Throughout the months since the umpire issued his award, the Brohlins have provided Meridian with access to new documents and further access to the Brohlins' home for yet another inspection. During this time, Meridian has not kept its insured informed about the status of its claim investigation, has not provided any information regarding what portion of the claim will be paid, and has not made any offer to cover any damages beyond the initial payment made approximately one year ago. This treatment of an insured is an unfair practice in violation of Section 541.061 of the Texas Insurance Code.

Meridian has had more than adequate time to analyze the claim and make an offer to cover the damage, but it has failed to do so. As of the date of this letter, Meridian has not made an indication as to whether it believes this weather event is covered under the Policy or what amount of damage, if any, it agrees to cover under the Policy, despite having ample time to make such decision. The Covered Event occurred during the Policy period, damaged Covered Property, and the Brohlins provided timely notice of this claim. All Policy provisions for coverage have been met. This failure to confirm or deny liability within a reasonable span of time is a violation of Sections 541.060(a)(2, 3, 4) of the Texas Insurance Code. Additionally, in conducting its investigation of this claim, Meridian has engaged in bad faith in its actions related to the umpire's award and its efforts to avoid paying such award.

**Direct Damages:**

The umpire and the Brohlins' appraiser agreed as to the value of the damages to the Covered Property in the award (the "**Award**"):



EXHIBIT C

EXHIBIT A

Meridian Security
Patrick Kemp, Esq.
Page 3
August 16, 2023

| Structure | Replacement Cost Value | Actual Cash Value |
|---|---|---|
| Dwelling | $483,038.18 | $461,621.78 |
| Appurtenant Structures | $347,525.03 | $331,053.39 |
| **TOTALS:** | $830,563.21 | $792,675.17 |

Subsequent to the umpire's award, Meridian had questions about the amount of the Pella window bid. In the original estimate provided by the Brohlins' appraiser, the windows are shown to have an ACV of $248,266.67 and an RCV of $263,646.02. After receiving Meridian's complaints about the window figure and as a gesture of good faith, the Brohlins' appraiser agreed to reduce the window estimate to $219,705.02. Meridian rejected this good faith offer and questioned the integrity of the appraiser in the process. Subsequent to the good faith offer by the Brohlins' appraiser, Pella provided a revised estimate showing that the true RCV figure for the windows is $243,962.11. This revised estimate was provided to Meridian through its counsel on April 12, 2023.

In a show of good faith, the Brohlins have agreed to reduce their RCV claim by $19,683.91 to match this revised Pella estimate.[1] Accordingly, with the Brohlins' good faith reduction, the total RCV Award is $810,879.30 and the total ACV Award is $774,139.49.[2] Per the information provided by Meridian, it made an initial payment on this claim of only $104,322.25. The claim is subject to a deductible of $8,419.00. Accordingly, Meridian owes a balance of $661,398.24 for the ACV of the Brohlins' claim. Once the Brohlins complete repairs, they will expect to be compensated the remaining $36,739.81 for the recovered depreciation. Demand is hereby made that Meridian immediately tender the amount of $661,398.24 and acknowledge its agreement to pay the accumulated depreciation due and owing after repairs are made.

**<u>Interest and Attorneys' Fees:</u>**

Meridian has known all of the above information for months. The umpire issued his award on February 21, 2023. My office provided Meridian's counsel with the revised Pella bid on April 12, 2023. Meridian had an additional inspection in May. My office sent several hundred documents to Meridian's counsel in June. Meridian's only response at that point was to request additional documentation related to the Brohlins' appraiser and his compensation, which was plainly not related to any investigation or adjustment of the claim but was instead an attempt by Meridian to avoid the Award.

Throughout this time, my office made multiple requests of Meridian, through its counsel, for an update on whether Meridian would pay the Award (or any portion thereof) and for a detailed

---

[1] Should Meridian continue to act in bad faith and continue to breach their contractual and statutory obligations, the Brohlins reserve any rights they may have to seek additional damages.

[2] The RCV number for the revised Pella bid was reduced by the same percentage (5.83%) for depreciation as used in the Brohlins' appraiser's original estimate for windows.



**EXHIBIT C**

**EXHIBIT A**

Meridian Security
Patrick Kemp, Esq.
Page 4
August 16, 2023

explanation as to what is in dispute in the Award (this request was made on April 12, 2023). Meridian has never provided any answers to any questions and has never offered any reason why it has failed to pay the Award. The only correspondence received by Meridian was an April 3, 2023 letter from Julie Wallace, but this letter only contains accusations against the Brohlins' appraiser and the umpire, questions about a few damages items (without detail), and a copy and paste of several policy provisions. This letter fails to provide detailed information as to what portions of the Award are approved or disputed or any reasons for such dispute. It likewise fails to detail what damage to the Brohlins' property is subject to any exclusion under the Policy.

Meridian has provided no further information or explanation regarding its positions, despite being provided an updated window bid, having an inspector at the Brohlins' home, and receiving several hundred pages of documents. Instead, Meridian had its counsel appear at an initial hearing on this matter in July 2023 and offer several accusations against the Brohlins' appraiser and the umpire during the hearing.

Because Meridian failed to pay the umpire's Award within 60 days, it violated the Prompt Payment of claims subchapter of the Texas Insurance Code. Accordingly, the unpaid portion of the umpire's Award, $661,398.24, is incurring simple interest at 5% above the post-judgment interest rate. The current post-judgment rate is 8.25%, meaning the unpaid balance has incurred simple interest of 13.25% since April 22, 2023. Thus, as of the date of today's letter, this unpaid ACV value has incurred simple interest of $27,851.21, which is due and owing.

Because of Meridian's intentional and knowing bad faith in failing to timely pay this claim, the Brohlins will be able to recover to 18% interest their overall award. In the event this matter proceeds, the Brohlins reserve the right to seek this higher interest rate.

In addition, the Brohlins have retained this firm to represent them in this action and will seek to recover their reasonable and necessary attorneys' fees as allowed by Texas law, including Chapter 38 of the Texas Civil Practice and Remedies Code, Section 541.152 of the Texas Insurance Code, and the Texas Deceptive Trade Practices and Consumer Protection Act. As of the date of this letter, these fees total $8,309.39.

Demand is hereby made for Meridian to pay the sum of $697,558.84, which represents: (1) the full value of the umpire's ACV Award minus the Brohlins good faith reduction for windows; (2) the interest due and owing for Meridian's violation of the Prompt Payment of claims statute; and (3) the Brohlins' reasonable and necessary attorney's fees as of today's date.

If this sum is not paid, the Brohlins reserve all rights to bring all legal claims related to this matter, including claims that may not have been specifically set forth in this letter.



**EXHIBIT C**

# EXHIBIT A

Meridian Security
Patrick Kemp, Esq.
Page 5
August 16, 2023

They will claim additional sums as attorneys' fees, seek additional damages available under the DTPA and the Texas Insurance Code, as well as any other amounts to which they are entitled in law or equity.

Respectfully,

Matt W. Sherwood

MWS/klt

**EXHIBIT C**

# EXHIBIT A